UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ADIL TOMA,

                  Petitioner,                Case Number: 02-10168-BC
                                                Honorable David M. Lawson

v.

JOHN CASON,

                  Respondent.

_____/

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

       The petitioner, Adil Toma, a state prisoner at the Egeler Reception and Guidance Center in

Jackson, Michigan, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. The petitioner challenges his 1995 convictions for first-degree felony murder, Mich. Comp.

Laws § 750.316(1)(b), and possession of a firearm during the commission of a felony ("felony

firearm"), Mich. Comp. Laws § 750.227b. He is serving a life sentence without the possibility of

parole for first-degree murder and a consecutive prison term of two years for felony firearm. The

petitioner advances grounds for relief involving ineffective assistance of counsel, the improper

admission of evidence, coercion of the jury, and prosecutorial misconduct. The respondent argues

that the petitioner's claims are not cognizable in federal habeas corpus, are procedurally defaulted,

and lack merit. The Court finds that the claims lack merit and therefore will deny the petition.

I.

       The petitioner was tried by a jury in the Oakland County, Michigan Circuit Court in February

of 1995. The Michigan Supreme Court set forth a detailed description of the facts supporting the

petitioner's convictions:

Defendant's convictions arose from events that occurred sometime around 10:30 p.m. on the night of November 29, 1993, when Steve Burge was shot in the face and doused with gasoline at the front door of a residence he shared with Margo Evita (now known as Margo McPherson) and her two children. Margo testified that she had temporarily cohabited with defendant on two prior occasions under circumstances that she described as platonic. However, during the second of these periods, which lasted about a month, defendant began making unwelcome sexual overtures, and personal items went missing from Margo's bedroom. After an incident when defendant tried to imprison Margo in his house, she moved in with her mother until she was able to lease a unit in a duplex house. Steve, Margo's boyfriend, later moved in with her. In the months before the killing, Margo observed defendant drive past this house on numerous occasions, and, once, defendant stopped in and offered to pay Margo's rent if Steve would move out.

Margo testified that on the night of November 29, 1993, someone kicked the front door open while she was half-asleep on the couch and Steve was watching football on television. Margo ran to her children in another room, and later came out to find Steve stumbling back through the front door, dripping with gasoline and bleeding profusely from a gunshot wound to the cheek. Through the window, Margo saw a man of defendant's build, wearing a mask and light colored surgical gloves, struggle with her neighbor, Danny Parenteau, and then run away. After Steve was transported to the hospital, Margo observed an unfamiliar hat with hair attached to it in her living room, a gas can in front of her house, and a mask near the gas can. She reported to the police her suspicions that defendant was the assailant.

Danny Parenteau testified that on the night in question, he was watching football on television when he heard a gunshot from the house across the street. Danny ran outside and observed Steve and another man struggling inside the front door of Steve's house. Steve forced the other man out of the house, and, when Danny approached to assist, he noted that Steve was covered with blood. As Steve collapsed, he shoved the other man away. Danny realized that this other man, who had also fallen to the ground, was armed with a gun, so Danny seized this man's wrist and called to his brother, Russell, for help. The man smelled of gasoline, was wearing white, see-through gloves, and fired off several shots that Danny was able to direct away from himself. Russell came to help, but took cover behind a tree when the assailant shot toward him. As this was occurring, Danny observed Steve get back up, while holding his throat, and make it through his front door before again collapsing.

Danny tried to drag or carry the armed man, but when Danny stumbled and lost his grip, he ran for cover for fear of being shot. The man was not wearing a mask at this point and he ran to a car, which Danny recognized as one that he had observed cruise past Margo's house on four or five occasions. Danny was able to identify defendant at a police lineup as the man with whom he had struggled. Russell Parenteau, who

-2-

lived with Danny, corroborated his brother's account and added that the assailant ran
to a car that was parked next to the home of another neighbor, John Talarico.

John Talarico testified that he lived next door to Steve and Margo and that, on the
night in question, he heard gunshots just after he got out of the shower, so he looked
out his window and saw a gunman wrestle with Danny and shoot toward Russell.
From a distance of fifty feet, John observed the gunman's face and identified him as
defendant.  Defendant departed in a car that John recognized as one that he had
observed cruise slowly by on several occasions, once with its lights out.

Donald Lumm, a neighbor who lived around the corner from Margo and Steve,
testified that on the night of November 29, 1993, he was in his kitchen when he
heard several shots.  Donald then heard squealing tires and, through his kitchen
window, saw a vehicle "take off really quick."  Donald identified a photograph of
defendant's car as the one he saw that night.

Steve died from what was determined to be a single gunshot wound to the right side
of his jaw, with the bullet traveling down through his neck.  From the scene, the
police recovered:  a white towel soaked in gasoline, a hat with a wig sewn to it,
several .38 caliber bullet casings, a mask found between the sidewalk and curb, and
a fingertip from a "rubber" glove.  The front screen door was broken outward and
covered with blood, but there was no visible damage to the interior door.  There was
also blood outside the house, around the door area and on the grass.  A subsequent
search of defendant's house turned up a large quantity of the type of gloves used by
meat packers.  [Footnote: Defendant worked as a meat cutter in a grocery store.]
Hairs were retrieved from the mask and hat, which were later determined to be
similar in all respects to a sample of defendant's hair.  Fingerprints recovered from
tape attached to the mask were later determined to be those of defendant.

The police began staking out defendant's house on the night of the killing, and
defendant was stopped in his automobile and taken into custody at 7:30 a.m. the
following morning.   The officers detected a strong smell of gasoline from
defendant's vehicle and hat.  After an attempted arraignment, where there was some
discussion regarding count five in the multiple count warrant, defendant was
overheard to make the following unsolicited statement: "They count five. They say
I killed five people.  I only kill one.  Why do they count five now?"

Defendant, whose native language is Arabic, testified at trial through an interpreter,
although he frequently answered questions in English.  His testimony described his
relationship with Margo, during the twelve days she first lived with him as that of a
husband and wife, just as it was when she again stayed with him.  Margo allegedly
began stealing from defendant and only moved out the second time after defendant
assured her that he would be her boyfriend and would come to visit her everyday and
pay the rent.  However, when defendant came over after working late one night, he

-3-

found Margo in the company of "John" and "Don."  The three of them were drunk and Margo was wearing only a slip.  After that, defendant stopped going to Margo's house.

According to defendant, around 3:00 p.m. on the day of the incident, Margo came to defendant's home and demanded that he sign over his house[] and car to her.  She also commanded him to give her all the money he had in the bank, and to vacate the house, taking only his clothes, but leaving the furniture.  Defendant refused, so Margo took his car.  She returned later, along with her children, in a different car, claiming that defendant's car was broken and that Steve had taken it to get it fixed.  Margo drove defendant to her house, and he played with Margo's children while waiting for Steve to return with defendant's car.  Margo's daughter brought a mask into the room and defendant and the children played with it.

The events that defendant next described are somewhat muddled by the circumstances that gave rise to the trial court and the Court of Appeals determinations that defendant was denied the effective assistance of counsel.  Specifically, defense counsel failed to clarify who defendant was identifying as his story unfolded.  Defendant mispronounced certain names, and the interpreter made certain incorrect translations of what defendant said.  However, as it was told to the jury, somebody named "Cherry" arrived, then within ten minutes Steve came home and denied being in possession of defendant's car.  Margo then said that John had defendant's car.  Then John, Jim, and "Rose" (and apparently "Don") entered the residence, with John and "Don" being armed with what the interpreter described as "a small gunshot, black" and a shotgun.  These men ordered defendant to pay a $3000 drug debt owed by Margo, and defendant tried to talk them into postponing payment until the next day.  John ordered defendant to sign a piece of paper, but defendant crushed it and threw it back in John's face.

The jury heard that John drew his gun while Margo yelled "kill him outside."  Steve tried to grab John's hand, and defendant began fist fighting with "Jimmy."  Defendant's blows caused Jimmy to bleed and run away, so defendant then engaged "Rose" in a fight that began inside and continued outside on the concrete.  Defendant heard a shot and then "Cherry" came out and said "John kill Steve."  Then John emerged from the house holding a black gun that had a nine-shot capacity.  John ran "to Don Andrews," then "Don" came out of the house and tried to hit defendant with his shotgun, so defendant began fighting "Don" and "Rose" simultaneously.  Defendant disabled "Don" with a kick between the legs, then made his way down the street where he found his car and effected an escape.

Defendant then recounted that he went home and had a beer.  Feeling hungry, he went out for a kabob, and stopped at a store.  After returning home, he drank a second beer, then slept until it was time to get up for work.  He was stopped and arrested on his way to work the next morning.

-4-

> Although defendant did not raise insanity as a defense at trial, he was cross-examined, over a defense objection to inadequate foundation, regarding whether he gave a version of the relevant events to Dr. Mae Keller, a clinical psychologist who had interviewed him pursuant to a notice that he intended to interpose an insanity defense. Defendant was further questioned regarding a different version that he had supposedly given to Keller. Keller was then permitted to testify, over a defense objection on the basis of privilege, as a rebuttal witness that defendant described routine activities on the day and night in question, and that these activities did not include even being at Margo's house.

*People v. Toma*, 462 Mich. 281, 285-91, 613 N.W.2d 694, 695-98 (2000). The petitioner was convicted of first-degree felony murder and possession of a firearm during the commission of a felony. On March 29, 1995, the petitioner was sentenced to serve life without parole for the first-degree murder conviction with a prison term of two years for the felony-firearm conviction.

The petitioner thereafter filed a motion for a new trial and evidentiary hearing based on ineffective assistance of trial counsel. Pursuant to a remand from the Michigan Court of Appeals, the trial court conducted a "*Ginther* hearing" in December of 1996 on the issue of ineffective assistance of counsel. *See generally People v. Ginther*, 390 Mich. 436, 443-44 (1973) (holding that "[a] defendant who wishes to advance claims that depend on matters not of record can properly be required to seek at the trial court level an evidentiary hearing for the purpose of establishing his claims with evidence as a precondition to invoking the processes of the appellate courts"). The petitioner and one of his two trial attorneys testified at the *Ginther* hearing, in addition to a witness who had been prevented from presenting hearsay testimony at trial. The Michigan Supreme Court described the testimony at the *Ginther* hearing as follows:

> At that hearing, defendant testified that: "Cherry" was Steve's girlfriend, "Jimmy" was Cherry's brother and Margo's boyfriend, "Don" was prosecution witness Danny Parenteau, "Rose" was prosecution witness Russell Parenteau, and "John" was prosecution witness John Talarico. Errors by the interpreter at trial were noted.

-5-

Defendant had not said that John entered holding a "gunshot," but had stated that John entered, then "Don" entered holding a small black machine gun. Also, defendant had not said that John was running "to Don Andrews," but had said that John was running "to Don and Rose's," meaning that John ran toward the house of Danny and Russell.

[Footnote: At defendant's preliminary examination, Margo testified that defendant had a relationship with a woman named either "Sherry" or "Cherry" Smith. At trial, Margo identified this person as Sherry. At the *Ginther* hearing, the prosecutor made an offer of proof that Janice Burge could testify that her son, Steve, did not have a relationship with anyone named "Cherry" and that Margo had been Steve's girlfriend.]

Defendant's trial counsel testified that he did not notice that defendant was saying "Rose" instead of "Russ" and "Don" instead of "Dan," and that it was possible that he had become accustomed to his client's accent. Further, defendant's counsel conceded that from his first contact with defendant until the end, defendant made major adjustments in his story. Originally defendant claimed not to have been present at Margo's on the night of the killing. The evolving events, as defendant claimed to remember them, formed the basis for the defense theory of the case.

*People v. Toma*, 462 Mich. at 291-92, 613 N.W.2d at 698-99. At the conclusion of the hearing, the trial court found that the petitioner's counsel had been ineffective and granted the petitioner's motion for a new trial.

The prosecution appealed to the Michigan Court of Appeals, and that court affirmed the order of the trial court in a *per curiam* opinion. *People v. Toma*, No. 203029 (Mich. Ct. App. Aug. 4, 1998). The Michigan Supreme Court granted leave to appeal, reversed the decision of the Michigan Court of Appeals, and remanded the case to the Michigan Court of Appeals for consideration of the issues not addressed in that court's previous decision. *People v. Toma*, 462 Mich. 281, 613 N.W.2d 694 (2000). The Michigan Court of Appeals found the remaining issues to be without merit and affirmed the petitioner's convictions. *People v. Toma*, No. 203029, 2000 WL 33406927 (Mich. Ct. App. Sept. 22, 2000). The petitioner's subsequent application for leave to

appeal in the Michigan Supreme Court was denied. *People v. Toma*, 465 Mich. 855, 632 N.W.2d 144 (2001).

The petitioner has filed a petition for writ of habeas corpus in this Court, presenting the following claims:

> I. The failure of defense counsel to clarify the trial testimony of this non-English-speaking defendant violated the petitioner's right to the effective assistance of counsel, the right to testify and present a meaningful defense, and to a fair trial.
>
> II. Where the petitioner did not raise an insanity or diminished capacity defense, it was a statutory violation to impeach him with his statements made to the forensic examiner; counsel's failure to object effectively constituted ineffective assistance of counsel.
>
> III. The elicitation of the numerical split and the trial court's comments to the deadlocked jury were coercive and violated the petitioner's rights to a fair trial and an impartial jury; counsel's failure to object constituted ineffective assistance of counsel.
>
> IV. The trial court correctly held that the petitioner was denied the effective assistance of counsel by his attorney's failure to impeach key prosecution witnesses with their criminal histories.
>
> V. The petitioner was denied a fair trial by repeated instances of prosecutorial misconduct in closing argument; counsel's failure to object constituted ineffective assistance of counsel.
>
> VI. The trial court misapplied the hearsay rule and erred reversibly in prohibiting defense witness Frank Raymore from testifying that he heard Margo DeVita demanding money from the petitioner at a time close to the killing.

The respondent has answered the petition and contends that some of the petitioner's claims are not cognizable in federal habeas corpus, some are procedurally defaulted, and all of the claims lack merit.

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

> As amended, 28 U.S.C. § 2254(d) imposes the following standard of review for habeas cases:
>
> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000); internal quotes omitted). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court

shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409, 410-11.  *See also King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Harbison v. Bell*, 408 F.3d 823, 828-29 (6th Cir. 2005); *McAdoo v. Elo*, 365 F.3d 487, 493 (6th Cir. 2004); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

A.

The petitioner presents three main ineffective assistance of counsel claims: first, that counsel was ineffective for failing to clarify the petitioner's testimony at trial; second, that counsel was ineffective for failing to raise at trial the prior criminal conviction of one prosecution witness and the pending criminal charges against a second prosecution witness; and third, counsel was ineffective for failing to object to certain procedural and evidentiary errors.  The Court will examine the first two as stand-alone issues, and the third in the context of the associated errors.

1.

The petitioner first contends that he received ineffective assistance of trial counsel and was deprived of an opportunity to present a meaningful defense or receive a fair trial when defense counsel failed to question the petitioner at trial to clarify whom the petitioner was naming in his testimony.  The petitioner, who speaks limited English, testified through an interpreter at trial, implicating many of the witnesses against him as participants in the shooting.  The petitioner identified those present at the shooting using only their first names, and he argues that his pronunciation of the names or the interpreter's communication of the names was so confusing as to lead the jury to believe that the petitioner was talking about other, unidentified people, making his testimony seem incredible.  The petitioner argues that trial counsel erred by allowing the petitioner to identify the people present at the shooting using only their first names and by failing to clarify the names or to elicit other identifying information about the people he named on cross-examination.

-10-

The petitioner argues that these errors deprived him of a meaningful opportunity to present a defense and failed to subject the prosecution's case to meaningful adversarial testing.

In the petitioner's version of the shooting, John, Dan, Russ, and Jimmy were involved in a "shakedown" of the petitioner to pay Margo's $3,000 drug debt, and Steve was shot when he attempted to stop them. Because the petitioner used first names that may have been difficult to discern correctly through the petitioner's and the interpreter's accents and because defense counsel failed to ask any questions to clarify the identities of these people, the jury may have been confused. Without any last names or clarification, it is questionable that the jury would have understood that "John" was John Talarico, Margo's next-door neighbor who did not admit to being present at Margo's house that night but testified that he heard gunshots, looked out his window, and saw the petitioner wrestle with Danny and shoot toward Russell. It is questionable that the jury understood that "Rose" was Russell Parenteau, Danny's brother, or that "Don" was Danny Parenteau, who testified that he ran toward Margo's house when he heard a gunshot and saw Steve struggling with another man. And while John, Russ, Dan, Margo, and Steve were mentioned in other testimony or appeared as witnesses in the case, two people who the petitioner alone testified were present, Cherry and Jimmy, were not identified in any way. In closing arguments, the prosecutor repeatedly argued that the petitioner's story was nonsensical:

> The only thing that's hard to understand in this case, is the defendant's story–and I emphasize the word story. I'm not really going to get in to all the little details of what he said. It's somewhat incomprehensible to me. It's up to you. Your [sic] the jurors. You're the determiners of fact. You're the ones who decide whether or not any of the things he said made any sense.
> . . .
> Did you notice that he said, after admitting being at the scene with Rose and Jerry and Jimmy and all the others–which I submit to you are figments of his imagination–
> . . .

-11-

And then we know that the version he gave you in court, that he was there and there was a struggle–and once again, I'm not going to go into all the details of that. It was somewhat incomprehensible to me. So, I don't think that I'd do it justice.

Tr., 2/10/1995, at 43-44.

The trial judge, a unanimous panel of the Michigan Court of Appeals, and two Michigan Supreme Court justices found that the petitioner was denied the effective assistance of counsel. The Michigan Court of Appeals explained that

[t]he rambling translation of defendant's testimony failed to present the jury with a fair opportunity to understand defendant's version of events or assess defendant's credibility. Counsel's failure to take measures to present defendant's side of the story in clear terms for the jury's consideration was a mistake so serious as to constitute a failure to function as an attorney as guaranteed by the Sixth Amendment.

*People v. Toma*, No. 203029, 1998 WL 1990472, at *2 (Mich. Ct. App. Aug. 4, 1998). The dissenting opinion from the Michigan Supreme Court reached a similar conclusion, noting that

Defendant's testimony, if clarified, could not have been more damaging than it was in its garbled and unintelligible state.
. . .
Defense counsel's shortcomings allowed the prosecution to argue effectively that defendant's testimony was a figment of his imagination, undermining his credibility in the eyes of the jury. The presentation of his client's testimony was indispensable to the creation of the defense's theory of the case. Counsel's role in its presentation failed to meet the objective requirements for reasonable assistance of counsel when compared to professional norms. In fact, he was responsible in large part for the unintelligibility of defendant's testimony.

*People v. Toma*, 462 Mich. at 312-13, 613 N.W.2d at 708.

The majority of the Michigan Supreme Court, however, found that the petitioner was not denied effective assistance, concluding that "counsel's failure to elicit elaborative testimony from defendant was neither deficient nor prejudicial." *People v. Toma*, 462 Mich. at 303. The court pointed to defense counsel's testimony at the *Ginther* hearing that the defense repeatedly questioned the petitioner regarding his story before the trial, that the petitioner first claimed that he was not at

-12-

the house on the night of the shooting, but that his story evolved and finally solidified just before the trial started, when the petitioner admitted being present at the house but accused others of the shooting. "Under these circumstances," the court explained, noting that the petitioner's version of events was contrary to some of the physical evidence, "no reasonably competent attorney would have thought it advisable for defendant to relate his story in sufficient detail to enable its veracity to be checked by comparing it to the physical evidence or subjecting it to precise cross-examination." *Id.* The court added that "[i]t may well be that defense counsel's failure to nail down the details of defendant's story before trial was the only way that counsel could aid defendant in presenting his story within counsel's ethical obligation not to knowingly offer evidence that counsel knows to be false." *Id.* at 303 n.16. The court explained that the petitioner's vague testimony, "advancing an alternative exonerating theory in general and somewhat unintelligible terms," had the effect of precluding detailed cross-examination because the prosecutor would be unlikely to ask questions to which he did not know the answers. *People v. Toma*, 462 Mich. at 304. In other words, the Michigan Supreme Court majority viewed defense counsel's presentation of his client's testimony in vague and confusing terms as trial strategy.

Or perhaps not. "*Even if this was not counsel's express plan*, it would have been dangerously inept of him to intentionally provide defendant with the opportunity to offer more details such as the magazine capacity of John's gun." *Id.* at 304-05 (emphasis added). The incoherence of the petitioner's statement worked to his advantage, the court said, by giving the petitioner the opportunity to deny committing the crime while disguising the inconsistencies in his story. The court questioned whether a "clarified" version of the petitioner's story would have been more believable. *Id.* at 305 n.20. For example, had defense counsel clarified that "Don" and "Rose"

-13-

were Danny and Russell Parenteau, the prosecution could have called as witnesses the friends and family members who were watching football with them in their home when they heard a gunshot from Margo's house. *Id*. The court concluded that the petitioner's clarified story that many of Margo's neighbors conspired to frame the petitioner was no more believable than the unclarified version of the story the jury actually heard.

The court held that the petitioner was not prejudiced by his counsel's failure to clarify his testimony because the evidence against the petitioner was overwhelming and the petitioner's clarified testimony was no more believable than his testimony at trial. The petitioner's "clarified" testimony indicated that John was carrying a machine gun rather than a shotgun, but because .38 caliber casings were found that the scene, it was to the petitioner's advantage that the gun was described as "a small gunshot, black." *People v. Toma*, 462 Mich. at 308. The court also noted that the jury may have understood the names through the petitioner's accent and the interpreter's communication of his testimony. Because the jury did not have the transcripts of the testimony, it is not certain that they misunderstood Russ as "Rose" and Dan as "Don" as the transcriber did. *Id*. Because defense counsel presented the theory that others present at the killing were seeking to blame the petitioner, it stood to reason that some of the witnesses against him were part of this group. The court concluded that the petitioner's testimony was so unbelievable that the uncertainty surrounding his testimony helped him because it gave the jury a chance to speculate on what he actually meant to say; it also allowed him to rely on his counsel's opening argument describing what the evidence would show. The court therefore held that the petitioner failed to show that counsel's performance fell below an objective standard of reasonableness or that counsel's conduct denied him a fair trial; furthermore, the trial was fundamentally fair and the verdict was reliable.

-14-

The two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must establish that his attorney's performance was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. Counsel's performance is deficient if the attorney's representation "fell below an objective standard of reasonableness." *Id*. at 688. The defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. However, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. The Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that the proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688; internal quotes omitted). Counsel's conduct is entitled to the strong presumption that it falls within the wide range of reasonable professional assistance, and the petitioner must overcome the presumption that the conduct "might be considered sound trial strategy." *Strickland*, 466 U.S. at 688 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. A court making this determination must consider the totality of the evidence before the factfinder. *Id*. at 695. "[A] verdict or conclusion only weakly

-15-

supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 695-96.  Unless the petitioner demonstrates both deficient performance and prejudice, "it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  *Strickland*, 466 U.S. at 687.

The petitioner argues that counsel's performance was deficient where counsel failed to clarify the petitioner's testimony with regard to the people he testified were present at Margo's house when the shooting took place.  The petitioner's argument in this regard is persuasive. The rambling and undirected account of the day's events rendered by the petitioner, referring to personages whose identity could remain for the jury nothing more than a mystery, failed to inform the jury fairly of the petitioner's defense.  It gave heft to the prosecution's arguments that the defendant fantasized the presence of others at the scene and that his incomprehensible tale was unworthy of belief.

The state supreme court majority concluded that trial counsel's "decision" to present his client's version of events in unintelligible and confusing terms amounted to trial strategy and therefore complied with *Strickland*'s performance prong.  The Court believes that determination unreasonably applies *Strickland*.

As a general rule, trial counsel's strategic decisions on how the trial is to be conducted are afforded great deference. As the Supreme Court explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's

-16-

> conduct falls within the wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the circumstances, the
> challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689 (internal quotes and citations omitted).  It is equally true that "errors of tactics or omission do not necessarily mean that counsel has functioned in a constitutionally deficient manner."  *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

However, "strategic" choices that have no hope of succeeding, are made without adequate investigation or preparation, or actually imperil the defendant's case cannot be considered "sound."  For instance, in *Wiggins*, 539 U.S. at 527-28, a death penalty case, the Supreme Court held that the state court of appeals unreasonably applied *Strickland*'s governing principles in rejecting the petitioner's ineffective assistance claim because the state court of appeals' conclusion that counsel's performance was within professional norms was objectively unreasonable.  Counsel did not present evidence at the penalty phase on the petitioner's personal background – a valid strategic choice under some circumstances – but counsel had failed to make a reasonable investigation into the petitioner's social history. *Ibid.* (noting that under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation") (citation and internal quotation marks omitted).  This failure reasonably to investigate, in turn, rendered the state court's deference to counsel's strategic decision not to present mitigating evidence of the petitioner's social history objectively unreasonable as well. *Wiggins*, 539 U.S. at 527-28 (stating that "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible").

-17-

Other "strategic" choices by counsel, such as the failure to object to obviously tainted and inadmissible evidence, *Ege v. Yukins*, 380 F. Supp. 2d 852, 874-76 (E.D. Mich. 2005), and the failure to cross-examine a key prosecution witness, *Higgins v. Renico*, 362 F. Supp. 2d 904, 916-17 (E.D. Mich. 2005), have been found to be so unsound as to negate the finding that counsel's performance tracked "prevailing professional norms." *Wiggins*, 539 U.S. at 521. Trial counsel's performance in this case must be viewed in a similar light. The petitioner was not attempting to persuade the jury that he was insane or lacked capacity to commit an intentional murder. Rather, he was attempting to present an alternate version of the facts. The choice between doing so in a clear, cogent manner and spinning a fantastic and incomprehensible yarn does not present two acceptable options, and the selection of the obviously defective alternative "was not a reasonable strategic decision entitled to deference." *Moss v. Hoffbauer*, 286 F.3d 851, 865 (6th Cir. 2002) (finding that defense counsel's reliance on the cross-examination of an eyewitness by a co-defendant unreasonable when the two defendants' interests were not aligned). As the dissenting Michigan Supreme Court justices noted, counsel's failure to clarify his client's testimony did not prevent the prosecution from cross-examining the petitioner as to contradictions between his testimony and that of other witnesses, or contradictions between his testimony and the physical evidence; nor did it prevent the prosecution from arguing that the petitioner's testimony was fabricated and involved the presence of fictitious or unidentifiable persons. Failing to clarify the petitioner's testimony may have increased its lack of credibility by making it seem too vague to be believed.

The *Strickland* Court emphasized that the reviewing court's task is to reconstruct the circumstances faced by trial counsel and "evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. The state supreme court disregarded this instruction when it

engaged in a *post hoc* apology for trial counsel's performance.  Trial counsel's explanation for his actions was fully explored at the *Ginther* hearing.  Presenting his client's testimony in terms so vague that it would defy effective cross-examination was not among trial counsel's justifications. Indeed, it is difficult to imagine how failing to identify properly the people who supposedly were at the scene would have advanced that goal.  Viewing trial counsel's performance through this imaginary lens does little "to eliminate the distorting effects of hindsight."  *Ibid.*  If this tactic truly was trial counsel's trial strategy, it certainly was not sound trial strategy.

The state supreme court's evaluation of the prejudice part of the test, on the other hand, does not unreasonably apply federal law as determined by the Supreme Court.  The petitioner argues that prejudice should be presumed because trial counsel completely failed to subject the prosecution's case to meaningful adversarial testing in the present case, relying on the holding in *United States v. Cronic*, 466 U.S. 648, 659 (1984), that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."  However, counsel's performance was not so deficient that it failed to subject the prosecution's case to meaningful adversarial testing.  Counsel was able to elicit clear testimony from the petitioner that Margo and John tried to extort thousands of dollars from the petitioner on the night of the killing, and that Steve Burge was shot to death by John after Margo encouraged or ordered him to kill someone and Steve tried to intervene and grabbed John's gun.  Counsel also elicited clear testimony from the petitioner that he and Margo were involved in a romantic relationship, had lived together like husband and wife, and that the petitioner had stopped seeing Margo after visiting her and finding her entertaining other men.  Tr. Vol. III at 224.  Thus, the petitioner was able put forth some semblance of his defense – that, after

-19-

he had broken up with Margo, he was victimized in an extortion plot by Margo and John in the presence of others and that the victim Steve Burge was an innocent party shot by one of the culprits when Steve tried to intervene.

Moreover, the jury was aware that the petitioner's native language was Arabic and that he spoke English with an accent. Margo testified that "his words weren't like you and I could talk but you could clearly understand what he was saying." Tr. Vol. II at 16. It is quite probable that under the circumstances, the jury was able to discern the petitioner's testimony as referring to the prosecution witnesses.

Furthermore, defense counsel's cross-examination of various prosecution witnesses bolstered the petitioner's account. Counsel's questioning of Margo about her drug addiction supported the petitioner's account that Margo needed money from the petitioner to pay a drug debt. He also elicited testimony from Margo that she had gotten a second phone line installed in the petitioner's house without his permission when she stayed with him and was accused of taking his checkbook, supporting the petitioner's theory that Margo was using him for his money. The defense presented a witness who claimed to have seen Margo arguing with the petitioner at his workplace and using his car shortly before the murder, contrary to Margo's testimony. Under cross-examination, Margo admitted that Danny and Russell Parenteau were friends of Margo and Steve and would sometimes watch football at their house. Defense counsel questioned Danny Parenteau and John Talerico about their relationship with Margo, showing that it was not unreasonable that they may have been at Margo's house that night, even before the first shot was fired. In fact, counsel asked Danny Parenteau, "So it's your testimony that you were never assisting Ms. Divita [sic] in trying to get some money . . . ." Tr. vol II at 143. Thus, counsel's cross-examination elicited the fact that Danny

-20-

Parenteau was one of the people alleged to be involved in the "shakedown" of the petitioner. Counsel cross-examined the officer to whom the petitioner said, "I only kill one," who admitted that he did not think the petitioner understood what was going on in court at the time he made that statement. Although it would have been better if counsel had sought clarifying details from the petitioner, counsel did not fail to subject the prosecution's case to meaningful adversarial testing. Therefore, prejudice cannot be presumed; it must be shown.

Both the Michigan Court of Appeals and the majority of the Michigan Supreme Court agreed that the evidence of the petitioner's guilt was overwhelming, and this Court agrees. Margo testified that she became afraid of the petitioner while she was living with him because he took her personal items, locked her inside the house on one occasion, and repeatedly drove slowly by her other residences after she moved out of the petitioner's house. Margo's mother testified that the petitioner would repeatedly drive past her house while Margo was staying with her, and that the petitioner told her that he wanted Margo to have sex with him and have his baby.

Steve Burge was shot in the face in Margo's house and found inside soaked with gasoline after struggling outdoors with the gunman. Police witnesses who arrested the petitioner the next morning noticed a strong smell of gasoline about him. Margo testified that Steve shouted for her to go to her children as she and Steve saw someone kicking in the front door, so she was not in the room with Steve when he was shot. Margo saw the masked gunman run away and testified that his build was identical to that of the petitioner. Police arrived a few minutes after the shooting and found a white towel soaked in gasoline, a hat with a wig sewn in it, several .38 caliber bullet casings, a mask found between the sidewalk and the curb, and a fingertip from a rubber glove. The petitioner's fingerprints were found on tape attached to the mask. Additionally, the petitioner's

voluntary comment in the presence of a police witness that he had killed one person, not five, may have been an inadvertent admission of the crime.

Margo's neighbors Danny Parteneau and Russell Parteneau testified that they went outside after hearing the first shot. Danny struggled with the gunman, trying to assist Steve. Danny identified the petitioner in a lineup and at trial as the shooter who was unmasked as he ran away and identified the shooter's car as that of the man who had been cruising slowly past Margo's house. John Talarico, Margo's next door neighbor, testified that he looked out a window after hearing shots and identified the petitioner as the then-unmasked gunman. Still another neighbor, Donald Lumm, testified that he looked out his kitchen window after hearing shots and squealing tires and identified a photo of the petitioner's car as that of the vehicle he saw speeding off immediately after the shooting. Evidence at trial suggested that the petitioner dyed his hair just before or immediately after the shooting.

The Michigan Supreme Court held that no prejudice flowed from trial counsel's performance because the clarified version of the petitioner's story was so incredible that no reasonable juror would have accepted it. On this record, that is not an unreasonable application of Supreme Court precedent. The petitioner's story was internally inconsistent or incredible. In the petitioner's version of the shooting, after John pointed the gun at the petitioner and Steve grabbed his hand, Dan started hitting John with the end of the shotgun. Later, however, after John ran away, Dan approached the petitioner and tried to hit him with the end of the shotgun, but the petitioner fought him off. It is unclear why Dan would act to protect the petitioner one minute, then attack him the next. The petitioner also testified that Margo slept in his bedroom with him in his bed when she lived with him. Later in his testimony, however, he claimed that the deadbolt lock on his bedroom

-22-

door was there because he was afraid of Margo, and that he had the lock placed on his door recently and slept with a knife under his pillow because she would threaten him with a gun and demand his house, car, furniture, and all the money he had in the bank.

In light of the overwhelming evidence of the petitioner's guilt, there is no reasonable probability that the outcome of his trial would have been different even if trial counsel had clarified the names of all of the people to whom the petitioner referred in his trial testimony. The petitioner's story that he went to Margo's house and calmly sat on her couch waiting for Steve to return with his car after Margo had tried to extort his house and all of his money from him was dubious. The petitioner's story about playing with the mask with Margo's daughter does not explain why the mask was found outside on the lawn. Four different neighbors, two brothers and two additional unrelated persons, all offered highly consistent and credible testimony identifying the petitioner as the gunman and his car as the gunman's car. It was extremely unlikely that these persons conspired to frame the petitioner in the short time between the shooting and the arrival of the police.

Margo testified that the petitioner's build was the same as that of the gunman. She did not identify the petitioner as the gunman, testifying that she did not see the shooting and that when she saw the gunman running away, he was still masked. Margo also testified that Steve Burge was conscious and speaking after being shot, that he identified the gunman only as a man, and that Steve repeatedly told her not to leave him after he was shot. This testimony rings true and fits the other known facts. The petitioner's story necessarily implies that at least Margo and John acted together to try to rob or extort money from him, were responsible for Steve's death, and were falsely accusing the petitioner of murder. If the petitioner's story were true, it is unlikely that Margo would have failed to identify the petitioner as the shooter. Under the petitioner's scenario, it is also more likely

-23-

than not that Margo would have claimed that Steve identified the petitioner as the shooter, since he was conscious and speaking before he died and dead by the time of the petitioner's trial. Furthermore, according to the petitioner, Margo owed John $3,000 for a cocaine debt and knew he was willing to shoot to kill for it, witnessed John kill Steve Burge, the man she identified as her boyfriend at the time of the shooting, and nonetheless perjured herself to exonerate John and frame the petitioner for Burge's killing. This scenario is highly unlikely.

In short, the evidence of the petitioner's guilt was overwhelming and his version of the shooting was highly improbable. Unsupported by any evidence other than the petitioner's testimony, there is no reasonable probability that the jury would have believed his story and reached a different verdict, even if trial counsel had clarified all ambiguous aspects of the petitioner's testimony.

Therefore, the Michigan Supreme Court's ruling that the petitioner failed to show that he was prejudiced by any trial errors defense counsel may have made in failing to clarify his testimony is a reasonable application of controlling Supreme Court precedent as set forth in *Strickland*.

Finally, the petitioner's argument that he was deprived of due process as a result of the uncertainty caused by the translator's pronunciation of the names related in the petitioner's testimony is without merit. The petitioner admits that any misunderstanding of the names was not necessarily the fault of the translator. The confusion generally resulted from the fact that the petitioner referred to the participants by their first names, the names were relayed with the petitioner's and the translator's accents, and defense counsel failed to ask any clarifying questions. The petitioner cites cases in which the defendants were not allowed translators or the translators received only limited use; in this case, the translator was provided and performed adequately. To

-24-

the extent that the translator's accent mirrored the petitioner's accent in his pronunciation of the names, the translation cannot be said to have deprived the petitioner of a fundamentally fair trial. There was no indication from the jury that they could not understand the translator.

2.

The petitioner also claims that trial counsel was ineffective for failing to raise at trial certain criminal convictions and pending charges against prosecution witnesses. Defense counsel failed to impeach Margo with her prior conviction for receiving and concealing stolen property over $100 and to cross-examine John Talarico regarding his incarceration on an unrelated charge of criminal sexual conduct at the time of the petitioner's trial. Upon remand from the state supreme court following its ruling on the other ineffective assistance of counsel claim, the Michigan Court of Appeals held that the petitioner was not prejudiced by counsel's failure to elicit this evidence. *People v. Toma*, 2000 WL 33406927 at * 5-6.

The Michigan Court of Appeals noted that the petitioner was entitled to cross-examine Talarico about his pending charge and incarceration because it was admissible to show that he had an interest in testifying in a manner acceptable to the prosecution to gain favorable treatment regarding his charge. However, the petitioner was not prejudiced by defense counsel's failure to allude to the charge because the prosecution could have effectively rebutted any negative inference arising from it. Talarico first identified the petitioner as the gunman in a lineup that took place about a year before Talarico was charged, and he also identified the petitioner as the gunman at the petitioner's preliminary examination months before the charge was filed.

Margo's prior conviction for receiving and concealing stolen property over $100 was admissible for impeachment purposes because her conviction involved a significant element of

-25-

dishonesty, the state court noted.  However, the potential effect of counsel's failure to impeach her on this basis is tempered by the fact that counsel did call her credibility into question by cross-examining her about her drug use and the accusation that she stole the petitioner's checkbook.  The failure to impeach Margo's testimony with a prior conviction does not undermine confidence in the outcome of the trial.

In light of the overwhelming nature of the other evidence of the petitioner's guilt, the prosecution's ability to rebut any such attack on Talarico's credibility, and counsel's calling Margo's credibility into question on other bases, the state court ruled that the petitioner failed to show that he was prejudiced by trial counsel's failure to attack these witnesses with regard to their criminal records.  This ruling is a reasonable application of applicable federal constitutional law as set forth in *Strickland*.  Therefore, this claim does not merit habeas relief.

## B.

The petitioner contends that he was deprived of due process when the trial court admitted evidence of statements he made to a forensic psychologist during an examination in contemplation of raising an insanity defense.  During the cross-examination of the petitioner, the prosecutor asked the petitioner about statements he made to Dr. Mae Keller during a court-ordered criminal responsibility evaluation at the state's Center for Forensic Psychiatry.  The petitioner explained that he had spoken with the doctor, but did not want to tell her about the shooting without his attorney present.  He said that the doctor's "partner" became angry when he refused to talk about the shooting, so the petitioner told the doctor that he did not go to Margo's that night.  Defense counsel objected when the prosecutor indicated that she would call Dr. Keller to the stand, but he did not cite the statute that bars the admission of statements made to personnel of the Center for Forensic

-26-

Psychiatry.  Despite defense objection and despite the privileged nature of the statements under state

law, the trial judge admitted the doctor's testimony regarding the story the petitioner had told her.

The doctor testified that the petitioner had told her he was not present at Margo's house when Steve

Burge was shot.

The Michigan Supreme Court found that, although the testimony was improperly admitted,

it was "nothing more than an erroneous evidentiary ruling at trial," because the trial court surely

would not have admitted the testimony had the proper statutory provision and case law been brought

to its attention.  *People v. Toma*, 462 Mich. at 293.  The court disagreed with the dissenting justices

that the evidentiary ruling deprived the petitioner of due process because the petitioner was required

to submit to the examination in order to assert an insanity defense.  The dissent stated that the

petitioner was unconstitutionally coerced to make the statement because if he had refused, he would

forfeit his right to assert an insanity defense; the majority noted, however, that the petitioner was

never actually put to a choice.  *Id*. at 294.  The court explained:

> The eventual erroneous ruling by the trial court, which occurred well after both the
> examination and defendant's decision to abandon the insanity defense, could not
> have reasonably been anticipated by assessing the extant rules of procedure.  If the
> mere possibility that a court will apply the law incorrectly gives rise to a justified
> reluctance to provide full disclosure to the examiner or to avail oneself of an
> available defense, then defendant's right to present an insanity defense would have
> been equally infringed even if the trial court had later correctly refused to admit any
> testimony regarding his statements to the examiner.

*People v. Toma*, 462 Mich. at 294-95.  Even if the error constituted a violation of the petitioner's

due process rights, the Michigan Supreme Court held, this error was harmless due to the

overwhelming untainted evidence of the petitioner's guilt.

The court weighed the prejudice against the petitioner from this impeachment testimony in

the context of the petitioner's credibility as a whole.  According to the petitioner's testimony,

following his "shakedown" and the shooting of Steve Burge by John and his cohorts, the petitioner did not contact police or take measures to protect himself; rather, the petitioner went to eat, stopped for groceries, went home and slept until it was time for him to go to work the next day. The court reasoned that, assuming the truth of the petitioner's testimony, the only explanation for this behavior is that the petitioner did not want to be involved in the investigation of Steve Burge's murder and chose to pretend that he was not there. Thus, the petitioner's statement to the doctor that he was not present at the time of the shooting was not significantly prejudicial; it was "consistent with the interpretation of defendant's postkilling conduct that was the most favorable to him." *People v. Toma*, 462 Mich. at 297.

The state supreme court also discussed the strength of the evidence of the petitioner's guilt and its view that the evidence as a whole rendered the erroneous admission of the petitioner's statement to the doctor harmless error:

> [T]he untainted evidence pointing to defendant's guilt is overwhelming. In an unsolicited statement, defendant essentially admitted the crime, saying: "They count five. They say I killed five people. I only kill one. Why do they count five now?" Two eyewitnesses positively identified defendant as the assailant, and, by his own testimony, he was present when Steve was killed. Defendant claimed that he was the intended robbery or extortion victim of the real killers, but took no precautions for his safety, did not call the police, and engaged in routine behaviors immediately after the killing. Margo testified about a pattern of stalking by defendant that was corroborated by her neighbors. Defendant's attempt to explain his frequent presence, by claiming that his promise to visit her everyday was the only way he could get Margo to move out of his house, defies common sense.
>
> Defendant's testimony is inconsistent with the physical evidence, while the testimony of Margo and her neighbors does not conflict. The fingertip of a rubber or latex glove found at the scene is consistent with Margo's testimony that the masked assailant wore light colored surgical gloves, as well as the fact that there was a struggle during which Danny kept defendant from pointing his weapon at him. The possession by, and availability to, defendant of such gloves supports the prosecutor's case. It is undisputed that Steve was not only shot in the jaw, but doused with gasoline. Defendant was arrested the next morning reeking of gasoline. The

-28-

recovery of a hat with a wig sewn to it, along with a mask that had tape on it bearing defendant's fingerprints, is consistent with the theory that defendant arrived at Margo's house dressed in a manner calculated to conceal his identity. Defendant's claim that Margo's daughter brought the mask into the room and that defendant played with it, does not explain the wig-hat or why the mask was recovered by the police from the sidewalk in front of the house. Nor does anything in defendant's account explain why he would calmly accompany Margo to her home, then bide his time in idle play with her children waiting for the return of his car, after Margo had supposedly demanded he give her his house, his furniture, and his money, and had stolen his car.

If someone named Cherry had come out of the house and said "John kill Steve," that statement would have been inaccurate when made. Steve was alive and still conscious when the police arrived, and he remained alive for another twenty hours. It was decidedly convenient for defendant that Cherry would make this inaccurate statement, thus permitting defendant to be removed from the place of the killing, yet still be able to identify John as its perpetrator. Defendant's story that Steve was shot inside the house while defendant was outside fighting others does not explain the large amount of blood found outside the house and on the broken exterior door. Defendant's story that John emerged from the house carrying a gun that had a nine-shot capacity imputes knowledge to defendant that is unlikely under the circumstances that he recounted. Defendant's claim to have prevailed in a fistfight with three men, two of whom were armed, is less than credible. Likewise, it appears to be a significant coincidence that defendant not only had his car keys with him, but was able to immediately locate his car when fleeing from armed assailants. By his account, his car had been taken from him earlier in the day and he was driven to Margo's house in a different car.

On one side of the scale, we have the consistent testimony of several eyewitnesses, the physical evidence, and defendant's unsolicited admission. On the other side, we have defendant's version of events that would be unbelievable even if not contradicted. Given the damage that defendant's own story did to his credibility, and the enormity of the untainted evidence, we conclude that any error stemming from the jury learning that defendant had, at some point, denied being at the scene to a psychologist was harmless. Defendant has not established that it is more probable than not that a different outcome would have resulted without the error.

In fact, the evidence in this case is so substantial that, even if we were to analyze this as constitutional error under a due process theory (e.g., that defendant was enticed to give up his privilege to be free from compelled self-incrimination and speak to the forensic examiner by the statutory assurance that his statements could not be used for the purpose for which they were ultimately admitted), we would, nevertheless, conclude that the error was harmless. It is clear to us that the prejudice from the

-29-

improperly admitted evidence, in view of the untainted evidence, was harmless beyond a reasonable doubt.

[Footnote: Constitutional error is either structural and subject to automatic reversal, or it is nonstructural and requires reversal only if the improperly admitted evidence, in light of the properly admitted evidence, was not harmless beyond a reasonable doubt. *Arizona v. Fulminante*, 499 U.S. 279, 309-310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *People v. Anderson* (*After Remand*), 446 Mich. 392, 404-406, 521 N.W.2d 538 (1994). Even the admission of involuntary confessions, which was once considered to be structural error, is currently understood to be subject to harmless error analysis. *Fulminante, supra* at 308-310, 111 S.Ct. 1246; *People v. Howard*, 226 Mich.App. 528, 543, 575 N.W.2d 16 (1997). There is nothing about the error in this case that would compel a more rigorous test than that applied to coerced confessions.]

*People v. Toma*, 462 Mich. at 298-302, 613 N.W.2d at 701-703 (some footnotes omitted).

The Michigan Court of Appeals also characterized the evidence of the petitioner's guilt as "overwhelming," both in its opinion affirming the trial court's grant of a new trial based on ineffective assistance of counsel, *People v. Toma*, 1998 WL 1990472, at *2 n.2, and in its subsequent opinion after remand finding that none of the petitioner's other claims merited reversal of his convictions.  *People v. Toma*, 2000 WL 33406927, at *3, *6.

The dissenters in the Michigan Supreme Court disagreed that the evidence of the petitioner's guilt was overwhelming, stating:

At the *Ginther* hearing and on appeal, the prosecution argues that defense counsel's errors did not affect the jury's verdict, because the evidence against defendant was overwhelming.  I disagree.  This was no "open-and-shut" case.  Not only did the errors of counsel prevent defendant from intelligibly presenting his theory of the case, they actually bolstered the prosecution's case.  They permitted the people to argue that defendant was imagining or fabricating his version of the events.

This is not a case where the evidence against the defendant was overwhelming. Instead, it is one in which there was a complete failure of the adversarial process, rendering it inevitable that the prosecutor's proofs would seem overwhelmingly persuasive.

*People v. Toma*, 462 Mich. at 314 (Kelly, J., dissenting).

-30-

It is well-established that "federal habeas corpus relief does not lie for errors of state law."

*Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Louis v. Jeffers*, 497 U.S. 764, 780 (1990)).

The Sixth Circuit Court of Appeals has explained:

> "[E]rrors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding." *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996) (quoting *Patterson v. New York*, 432 U.S. 197, 202 (1977)); *see also Spencer v. Texas*, 385 U.S. 554, 563-64 (1967).

*Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000). "Errors by a state court in the admission of evidence are not cognizable in habeas corpus proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994) (quoted in *Biros v. Bagley*, 422 F.3d 379, 391 (6th Cir. 2005)).

The erroneous admission of the statements the petitioner made in the forensic evaluation did not deprive him of a fundamentally fair trial in light of the overwhelming evidence of the petitioner's guilt and the incredible nature of his version of the shooting. The state supreme court's ruling that admission of this evidence was harmless beyond a reasonable doubt is itself a reasonable application of controlling federal constitutional law.

The United States Supreme Court has held that on habeas review of constitutional trial errors, the reviewing court must determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted). Federal courts apply the *Brecht* analysis when reviewing habeas petitions for constitutional trial errors regardless of whether the state court made a determination of harmless

-31-

error.  *See Carter v. Mitchell*, 443 F.3d 517, 536 (2006).  The state court's conclusion that the erroneous admission of the petitioner's statement constituted error that was harmless beyond a reasonable doubt was not contrary to or an unreasonable application of Supreme Court precedent. Although the statement called into question the petitioner's credibility, the petitioner's credibility also was called into question by the witnesses who identified him as the gunman as well as the physical evidence that contradicted his version of events.

The petitioner also argues that trial counsel was ineffective for failing to object to the examiner's testimony with the citation of the statute that forbade its submission.  Even if the omission of the citation constituted deficient performance, however, the petitioner cannot show that he was prejudiced by the error because the evidence against him was overwhelming.  The petitioner is not entitled to habeas corpus relief on this claim.

C.

The petitioner contends that the trial court's elicitation of the numerical split in the jury and the court's comments to the deadlocked jury were unduly coercive and denied him a fair trial before an impartial jury.  The Michigan Court of Appeals found that the petitioner had waived review of this claim by failing to object to the jury instructions at trial.  The court also concluded that the jury instruction was not unduly coercive and counsel was not ineffective for failing to object.  The Court need not address the procedural default issue because it concludes that the claim is without merit. *See Hudson v. Jones*, 351 F.3d 212, 215-16 (6th Cir. 2003).

During jury deliberations, apparently in response to notes from the jury, the trial judge called the jury into court and read a jury instruction designed for a deadlocked jury.  Then the court spoke to the jury foreman, who explained that the jury had not reached agreement on any of the proposed

-32-

counts.  After the foreman indicated that he wished to comment further, the judge instructed the

foreman and the jury to go back to the jury room and write down what they needed to tell him.

When the jury returned, the judge apparently started reading the note from the jury:

> THE COURT:  Please, there's one amongst us that . . .

> JUROR FOREMAN:  That will not make a decision based on the evidence.  It was
> our– the majority of our understanding that we can make a determination of guilt or
> innocence.  There's one amongst us that does not want to make a decision either
> way.

> THE COURT:  At this stage or ever?

> JUROR FOREMAN:  It's– your Honor, I think we're very early in this process and
> it would be my recommendation or position that we continue this process.  However,
> my colleagues don't necessarily share that.

> THE COURT:  Okay.  Let me tell you, you have been here just less than a few hours.
> I am prepared to go all week to get this matter resolved.  It is early in the process.
> The law requires that a decision– an individual, each individual juror make up their
> [sic] mind based upon the evidence.  Each individual juror has the obligation of
> deliberating on the evidence.  That is your understanding?  Now, does it have to be
> now?  Does it have to be when you go through everything?  We're not concerned
> with that.  But each individual juror must review the evidence and make a decision
> one way or the other.  Whatever decision it is, that's not up to me; but there has to
> be a determination by that individual one way or the other.  Do you all understand
> me?

> [no verbal response]

> THE COURT:  Are there any other questions?

> JUROR FOREMAN:  Except just reiterate that a decision has to be made?

> THE COURT:  There has to– let me make sure you all understand what I'm saying.
> I am not telling you nor are we telling you what that decision is made– what decision
> to make.  I am telling each of you, individually, that once you have reviewed the
> evidence, you are obligated to make a decision one way or the other.  And we have
> the law that tells you what you are to do.  And you will go through those instructions
> and I will point out to you, Section– in your instructions, 3.2, presumption of
> innocence, burden of proof, reasonable doubt.  Each of you, individually, must make
> a decision.  Is there any question there?

[no verbal response]

THE COURT: You understand we're not telling you what decision is to be made? But each of you has to make a decision. We are not telling you at what stage of the proceedings to make that decision, that is up to you. But a decision, one way or the other, based upon the law must be made.

Tr., 2/13/1995, at 7-9. The petitioner argues that it was coercive for the court to elicit the numerical split in the jury, to threaten to have the jury deliberate for a full week, and to repeatedly comment that a juror has a duty to come to a decision.

Supplemental charges for deadlocked juries have been expressly approved by the Supreme Court. *See Allen v. United States*, 164 U.S. 492, 501 (1896). When a habeas petitioner alleges that a court deviated from an approved *Allen* charge, the inquiry is whether "'in its context and under all the circumstances' the *Allen* charge was 'coercive.'" *Williams v. Parke*, 741 F.2d 847, 850 (6th Cir. 1984) (quoting *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060 (1965)).

In this case, the court's *Allen* instruction was sufficiently similar to the instruction approved by the Supreme Court. After a few hours of deliberating, the jury indicated that one member did not want to make a decision. The judge's deadlock instructions made it clear that each juror should follow his or her own conscience rather than simply follow the will of the majority. The judge stated that the law required each juror to make a decision based on the evidence and emphasized that the court was not telling any juror how to decide the case. In short, the trial judge made it clear that each juror should vote in accordance with the juror's convictions.

A careful review of the record shows that the court did not elicit a numerical split from the jury. Rather, that information was volunteered by the jury foreman. After the reading of the deadlock instruction, the jury returned with a written question. The court simply began reading the question, at which point the foreman interrupted and explained that one member of the jury did not

-34-

want to reach a decision either way. At no time did the judge ask the jury how they were split or encourage the foreperson to explain a numerical split. Furthermore, the jury was not actually "split"; rather, one juror was refusing to reach a decision one way or the other. The trial court repeatedly cautioned the jurors that he was not instructing them to reach a particular decision, but that each juror must make a decision.

In addition, the court's statement that he was "prepared to go all week to get this matter resolved" was not coercive. The jury began deliberating Friday afternoon and came into court for the deadlock instruction on Monday morning. As the judge properly noted, it was "early in the process" and his statement served to inform the jurors that they were not expected to reach a verdict quickly. In a case involving as many witnesses and charges as the case at bar, sound judicial practice suggests the judge should encourage the jury to continue to deliberate and take its time reviewing and discussing the evidence after the jury reports it has not reached a verdict after only a few hours.

Furthermore, although the judge stated that each individual juror had a duty to reach a decision eventually on each count one way or the other, the judge never stated that the jury must reach a unanimous verdict. On the contrary, the judge encouraged the jurors to discuss the evidence and any reasons they had for holding differing views, but also told the jurors that they must not give up their honestly held views and should try to reach unanimity through reasoned discussion. The court's deadlock instruction specifically informed the jury that "none of you should give up your honest beliefs about the weight and affect [sic] of the evidence only because of what your fellow jurors think or only for the sake of reaching agreement." Tr., 2/13/1995, at 5. This was a proper

-35-

instruction.  Because the instruction was proper, defense counsel was not ineffective for failing to object.

The ruling of the Michigan Court of Appeals that the instruction was not unduly coercive was a reasonable application of federal constitutional law, as was the court's ruling that the petitioner failed to show that counsel was ineffective for failing to object to the jury instructions as given.

D.

The petitioner contends that he was denied a fair trial by various instances of prosecutorial misconduct.  The respondent contends that this claim is procedurally defaulted because trial counsel failed to object to the alleged instances of misconduct at trial.  The petitioner argues that trial counsel's failure to object was ineffective assistance of counsel.

The Michigan Court of Appeals found that the petitioner waived this claim by failing to object at trial to the various instances of alleged prosecutorial misconduct.  However, the Michigan Court of Appeals nonetheless reviewed each instance of alleged misconduct for plain error, stating that "[t]he test for prosecutorial misconduct is whether the prosecution denied defendant a fair and impartial trial."  *People v. Toma*, 2000 WL 33406927 at *2.  That court concluded that because the alleged instances of prosecutorial misconduct were either minimally prejudicial or not misconduct at all, and the evidence of the petitioner's guilt was overwhelming, these claims did not warrant reversal of his convictions.  Because the Court agrees that the claim is without merit, the Court will not address the procedural default issue.  *See Hudson*, 351 F.3d at 215-16.

Prosecutorial misconduct will form the basis for habeas relief only if the conduct was so egregious as to render the entire trial fundamentally unfair based on the totality of the circumstances.

-36-

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643-46 (1974); *see also Caldwell v. Russell*, 181 F.3d 731, 736 (6th Cir. 1999) (stating that "[p]rosecutorial misconduct may warrant habeas relief only if the relevant misstatements were so egregious as to render the entire trial fundamentally unfair to a degree tantamount to a due process deprivation"). A court must focus on "the fairness of the trial, not the culpability of the prosecutor." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (quoting *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

A reviewing court must first determine whether the statements of the prosecutor were improper; if the statements were improper, the court must determine whether they were flagrant. *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006). Proper statements are arguments based on the evidence in the record that are not designed to inflame the passions or prejudices of the jury. *Id.* The Sixth Circuit has prescribed four factors to consider whether improper statements were flagrant: (1) the likelihood that the statements would prejudice the defendant or mislead the jury; (2) whether the remarks were isolated or part of a pattern; (3) whether the prosecutor's statements "were deliberately or accidentally presented to the jury"; and (4) whether the other evidence against the defendant was substantial. *Gall v. Parker*, 231 F.3d 265, 311 (6th Cir. 2000) (citing *United States v. Carroll*, 26 F.3d 1380, 1385-87 (6th Cir. 1994)).

The petitioner first argues that the prosecutor appealed to the sympathies of the jury by referring to the victim as a "beloved son," who died "terrified," "in an agonizing manner," becoming a "lifeless corpse" and "[a]nother number at the Wayne County Morgue." Tr. vol. IV at 33. The petitioner also contends that the prosecutor incited the passions of the jury by repeatedly commenting in closing argument that the crime was "horrifying" and "macabre" and that the petitioner was "brutal" and "sadistic," committing a crime of "bone chilling savagery." *Id.* at 34.

-37-

These statements, though colorful, were generally supported by the evidence at trial that a gunman wearing a Halloween mask burst into the house, shot the victim in the jaw, and doused him with gasoline, presumably with the intention of setting him on fire.  Such a crime would be horrifying, if not macabre.  Moreover, there was evidence that the victim was frightened and suffering pain after he was shot.  The prosecutor also stated, "And by now, ladies and gentlemen of the jury, you should be shuddering because you should realize that for the last week you have been seated in the same room with a brutal, sadistic murderer."  Assuming that these remarks were improper because they were calculated to inflame the passions of the jury, the Court must determine whether they were also flagrant.  First, the statements were not likely to mislead the jury and they were only marginally prejudicial.  A killing took place, and the prosecutor's use of descriptive words like "brutal" and "sadistic" were not likely to change the jury's understanding of the crime.  These remarks did appear to be part of a pattern and were deliberately placed before the jury.  However, the weight of the evidence against the petitioner was great; the prosecutor's use of strong descriptive words added little to the case.  In fact, at the *Ginther* hearing, defense counsel explained that he did not object to these terms because he did not think the jury thought much of the prosecutor's tactics.

The petitioner next argued that the prosecutor appealed to the jury's fears, emotions, and sense of civic duty when he stated, quoting novelist F. Scott Fitzgerald, that defendant was living proof of the notion that " in every society, no matter how lofty, there remains the jungle," and asked the jury for the verdict "that in your hearts, in your minds, and in your souls you know to be the true one because the defendant knew, too."  *People v. Toma*, 2000 WL 33406927 at * 3.  The prosecutor did not specifically appeal to the jury's social conscience or sense of civic duty, however.  As the Michigan Court of Appeals reasoned, these remarks did not ask the jury to convict apart from its

-38-

evaluation of the evidence.  The prosecutor's comments also did not appeal to the jury's irrational feelings.  The prosecutor asked them for the verdict they knew to be true in their minds, as well as in their hearts and souls.

The petitioner next contends that the prosecutor injected her personal opinion as to the petitioner's guilt by characterizing the evidence as constituting as strong a case as could be imagined and stating that the petitioner was guilty.  These remarks did not constitute an injection of personal opinion into the trial by the prosecutor, but rather were permissible comments on the strength of the evidence.

The petitioner next argues that the prosecutor denigrated defense counsel by commenting in rebuttal that, contrary to the petitioner's claim that Margo had tried to "shake down" the petitioner for money before the shooting, the only shakedown occurring was the defense's attempt to "shake down" the jury by portraying Steve Burge's death as a tragedy for which the petitioner was not responsible.  This remark does not denigrate defense counsel so much as it expresses doubt regarding the petitioner's version of events.  Because the petitioner testified at trial and set forth an alternative theory of the crime, the prosecutor did not engage in misconduct by arguing that the petitioner's theory did not make sense.  Although a prosecutor cannot express a personal opinion as to the truth or falsity of a witness, a prosecutor can argue that a witness is lying as part of a discussion weighing the evidence.  *See United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999).

The petitioner next argues that the prosecutor improperly urged the jury to speculate on other crimes of which the petitioner might be guilty when she commented that, but for Steve Burge's intervention, there could have been three additional victims: Margo and her two children.  The prosecutor did not say that the petitioner had committed crimes against Margo and the children,

however; she said that, had Steve not struggled with the petitioner, they may have been additional victims. This statement is supported by the evidence that the petitioner had brought a can of gasoline to the house, which supported the prosecution's attempted arson theory underlying two of the felony murder charges. Thus, this statement was not improper.

The petitioner claims that his attorney's failure to object to these instances of prosecutorial misconduct constituted ineffective assistance of counsel. However, the challenged remarks were either proper or only minimally prejudicial. Repeated objections to the prosecutor's colorful adjectives or sympathetic descriptions may have called attention to the characterizations. Viewed in the light of the strong evidence against the petitioner, there was no reasonable probability that the outcome of the trial would have been different if counsel had objected.

### E.

The petitioner contends that he was denied a fair trial when the trial judge improperly excluded hearsay testimony from Frank Raymore, one of the petitioner's co-workers, that he had heard Margo demand the petitioner's money and his car. The petitioner argued that he was prejudiced by the exclusion of this testimony, which would have bolstered his theory of the case. The petitioner also argued, *inter alia*, that the statements showed an intent, plan, or scheme to shake the petitioner down for money and/or property and were therefore admissible under Michigan Rule of Evidence 803(3).

The respondent contends that this claim is merely a state law evidentiary claim, which is not cognizable on federal habeas review and has not been exhausted as a federal constitutional claim because the petitioner only included a cursory mention of due process in his state court briefs.

-40-

The Michigan Court of Appeals denied this claim on the basis of state evidentiary law, finding that the testimony was properly excluded under the hearsay rule, because it did not, in fact, reveal any plan by Margo to extort money or valuables from the petitioner. Rather, the testimony, if believed, simply would indicated that she needed money and a car and sought these items from the petitioner, not that she had a plan or intent to commit extortion or robbery to get them.

As noted earlier, "errors in the application of state law, especially rulings regarding the admission or exclusion of evidence, are usually not to be questioned in a federal habeas corpus proceeding," *Cooper*, 837 F.2d at 286, "unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly*, 25 F.3d at 370.

In point of fact, the testimony describing Margo's out-of-court statement was not hearsay because it was offered to show that the extortionate statement was made, not for the truth of the matter asserted. *See People v. Jones*, 228 Mich. App. 191, 203-05, 579 N.W.2d 82, 87 (Mich. Ct. App.), *modified on other grounds*, 458 Mich. 861, 587 N.W.2d 637 (1998). The state courts' ruling was erroneous as a matter of state evidence law. However, the petitioner's state law claim concerning the trial court's exclusion of the proferred "hearsay" testimony of Frank Raymore is not cognizable on habeas review. *See Walker*, 224 F.3d at 552; *see also* 28 U.S.C. § 2254(a). Even if the petitioner had raised this claim as a federal constitutional issue, he is entitled to habeas relief only if he can show that the alleged evidentiary error so perniciously affected the prosecution of his case that it deprived him of the fundamental right to a fair trial.

The petitioner has not shown that excluding this testimony deprived him of a fundamentally fair trial. Raymore, a security guard at the grocery store where the petitioner worked, was permitted to testify that he saw Margo come to the store to speak with the petitioner three or four times. On

-41-

one of these occasions, he saw her go to the back of the store where the petitioner worked, then leave in the petitioner's car.  On two other occasions, he witnessed the petitioner and Margo arguing and during one argument, "there was a lot of yelling and screaming."  Tr. vol. III at 204.  He noted that the last time he saw the petitioner and Margo arguing at the store was just after Thanksgiving, around the time of the killing.  Thus, the petitioner was able to elicit testimony from the witness that Margo sought contact with the petitioner and borrowed the petitioner's car on at least one occasion, supporting the petitioner's story that Margo demanded money and the petitioner's car keys on the night of the shooting and somewhat refuting her testimony that the petitioner was stalking her.  The exclusion of the witness's testimony that Margo was demanding the petitioner's money and keys was not so fundamentally unfair that it rose to the level of a deprivation of due process.  This claim does not entitle the petitioner to habeas relief.

III.

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts.  The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: August 2, 2006

-42-

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 2, 2006.

s/Tracy A. Jacobs
TRACY A. JACOBS